**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

_____

| | | |
|---|---|---|
| Conflict International, Inc. and Conflict International Ltd. | : | |
| Plaintiffs, | : | 23-cv-2165 |
| | : | |
| v. | : | **VERIFIED COMPLAINT** |
| | : | |
| Stephen Komorek and API International Consulting Group, Inc., | : | JURY TRIAL DEMANDED |
| Defendants. | : | |

_____

Plaintiffs Conflict International, Inc. ("Conflict"), and Conflict International, Ltd., ("Conflict UK."), by and through their attorneys J. W. Bearden and Associates, PLLC, file their Verified Complaint against Defendants Stephen Komorek ("Komorek") and API International Consulting Group, Inc. ("API") and allege as follows:

<u>**INTRODUCTION**</u>

1.     This case is about a relatively inexperienced private investigator who was hired by Plaintiffs, a London, England private investigations firm, to help expand their business in the United States. After obtaining Plaintiffs know-how, client lists, and trade secrets, Defendant Komorek resigned without warning in the middle of the night taking with him clients, trade secrets, employees, and information. Defendant Komorek destroyed Plaintiff's company records in an apparent effort to mask his plans and activities. Komorek then waged a campaign of false statements, complaints, anonymous derogatory emails, false complaints, and other bad acts with

1

one purpose and one purpose only—to destroy Plaintiffs and their business relationships so that Komorek could commandeer their business and their clients as his own.

2.     Plaintiffs, who are long time reputable private investigative agencies, now seek substantial money damages and emergency injunctive relief to save their business, their reputation, and their livelihood from Defendants' personal vendetta.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that it is a civil action between citizens of New York and Ohio, and the amount in controversy on all claims exceeds $75,000, exclusive of interest and costs.

4.     Specifically, Plaintiff Conflict International, Inc. ("Conflict") is a citizen of the State of New York.  Plaintiff Conflict International, Ltd. ("Conflict UK") is a Limited Company based in London, England, United Kingdom. Defendant Stephen Komorek ("Komorek") is a citizen of the State of Ohio. API International Consulting Group, Inc. ("API") is citizen of the State of Ohio.

5.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

6.     Plaintiff Conflict International, Inc. is a New York domestic corporation and thus is a citizen of the state of New York.

7.     Plaintiff Conflict International, Ltd. is a United Kingdom limited company based in London, England and is a citizen of the United Kingdom.

8.     Conflict International, Inc. is a subsidiary of Conflict International, Ltd. and owned 100% by Conflict International, Ltd.

9.     Defendant Stephen Komorek is an individual and citizen of the State of Ohio.

10. API International Consulting Group, Inc. is an Ohio domestic corporation and thus is a citizen of the state of Ohio.

## FACTS

11. Plaintiff Conflict UK is a private investigative and security services business concern based in the United Kingdom. Although it is a successful and profitable business entity, Conflict UK is a small to medium sized business compared to other professional service entities. It employs approximately 10 full-time employes and 12 consultants on a part time basis.

12. Conflict UK is owned by Michael LaCorte and Jon Fawcett, both UK residents and citizens.

13. In 2010, due to an opportunity from a UK government scheme, known as the UK Trade and Investment, Conflict UK decided to open an office in the United States offering its private investigative services to a new market.

14. On February 25, 2010, Conflict filed its Articles of Incorporation with the New York Secretary of State.

15. Conflict remained inactive until 2017 when the company appointed local licensed investigator and the company commenced operations.

16. On February 13, 2019, Conflict filed its application for a Certificate of Authority with the Secretary of State of North Carolina.

17. Conflict is 100% owned and is a subsidiary of Conflict UK.

18. After incorporating, Conflict obtained private investigative licenses in both New York and North Carolina. These licenses remain active to this day. Other than in North Carolina and New York, Conflict has no other offices in the United States.

19.     Conflict's employees, officers, and directors are members of several professional investigative associations at the state, national, and international level. These associations are generally designed to provide camaraderie in the profession, offer continuing education, networking opportunities, and to share guidelines and ethical codes between its members and the public. One of those associations is the World Association of Detectives, Inc. ("WAD"), a Nevada non-profit corporation.

20.     In 2018, Conflict was looking to hire an investigator in the United States to assist in conducting and managing case investigations. During this time, several employees of Conflict traveled to a WAD conference then located in Las Vegas, Nevada. Also present at that conference was Defendant, Stephen Komorek.

21.     Komorek was attending the conference on behalf of another employer but began asking both LaCorte and Fawcett if they would be interested in working together.

22.     LaCorte, Fawcett, and another employee conducted several interviews of Komorek during the WAD Las Vegas conference.

23.     Komorek represented that he had years of experience in investigations and intelligence. Komorek also represented that he had significant experience and contacts in intelligence gathering from his time in the United States Army. Komorek further represented that he had a stellar and unblemished reputation in the investigative business.

24.     Komorek's representations were later found to either be untrue or grossly misrepresented to LaCorte, Fawcett, and the other Conflict employee. These misrepresentations regarding his background and career would continue, not only to other Conflict employees but also to third parties and potential clients while Komorek was employed with Conflict.

25.     On October 9, 2018, Defendant Komorek was hired by Conflict as an officer and later Vice-President of the corporation based, in part, upon his representations of military experience.

26.     As part of the employment process, Defendant Komorek signed a non-disclosure agreement as a Director of Conflict. *See* Exhibit A.

27.     Conflict and Conflict UK provide investigative and security services to an elite clientele. An important part of offering those services include providing confidentiality to its clients and safeguarding its relationships, employees, contacts, vendors, and sources.

28.     The non-disclosure agreement was reasonably necessary to protect Conflict's business in the investigative services industry.

29.     Komorek was subsequently given access to confidential and proprietary information by Conflict and Conflict UK. In the course of his employment with Conflict, Komorek had access to Plaintiffs' confidential information and trade secrets, including client contact information, in the performance of his duties.

30.     The non-disclosure agreement determined that all information received by Komorek from Conflict, whether oral or written or otherwise shall be treated as confidential.

31.     As part of that agreement, Komorek agreed to not "disclose, divulge, grant access, make public or afford access to or otherwise dispose, directly or indirectly, of through whatever means, media or manner, such Confidential Information to any third party and persons, either organization or individual." *Id*. at ¶ 8.3.

32.     Further, the non-disclosure agreement required Komorek to notify and obtain "explicit written consent" to disclose information. *Id.* at ¶ 8.4.

33.     The non-disclosure agreement states and provides that, "money damages are not a sufficient remedy for any breach of the agreement and that [Conflict] shall be entitled to claim of

specific performance or injunctive relief for breach or threatened breach thereof, in addition to any other remedies available….” *Id.* at ⁋ 15.

34.     Komorek specifically agreed to provide Conflict every reasonable assistance to enable Conflict to seek a protective order or other relief to prevent or limit disclosure of Confidential Information. *Id.* at ⁋ 9.

35.     Komorek breached the non-disclosure agreement by disclosing Conflict's proprietary and confidential information to various third parties including friends, other client contacts, associates, online blogs, professional associations, and by way of administrative complaints as detailed below.

36.     By violating his signed nondisclosure agreement and using Conflict's confidential and proprietary information, Komorek caused substantial damage and continues to cause damage as detailed below for the purposes of commandeering and damaging Plaintiffs' business, clients, and reputation solely for Defendants' benefit.

### *2020 Coronavirus and Defendant Komorek's Increasingly Erratic Behavior*

37.     In March of 2020, the worldwide transmission of the novel coronavirus occurred. Throughout 2020, many countries, including the United States placed restrictions on their citizens for work, travel, school, and public interactions. These restrictions varied by government and locale.

38.     For Conflict in the U.S., and more particularly in North Carolina where Conflict maintained its sole office, these restrictions were based on CDC recommendations. Conflict was able to carry on most of its business with the restrictions placed upon it by the federal, state, and local governments of the United States.

39. During this same period, Coronavirus restrictions were more intense in the United Kingdom than in the United States. UK Citizens were required to abide by more restrictive measures to include limits of time with others, curfew, travel, and even outdoor activity.

40. As a result, Conflict UK was more impeded than its U.S. subsidiary in the operation of its business. Conflict senior management were restricted to their homes during much of this period per UK government regulations.

41. Prior to the pandemic, Conflict's British senior managers were able to travel back and forth to the United States with ease to oversee and assist in the management of Conflict's fledgling U.S. business.

42. During the pandemic, travel was nearly impossible. Management and oversight of the U.S. business was accomplished by regular, online video meetings. Although useful, it did not substitute for occasional in-person management.

43. Through 2021, Conflict senior management began noticing a change in Komorek's behavior. In particular, Senior Management began receiving complaints from employees who Komorek was responsible for supervising.

44. On April 9, 2021, Conflict received a resignation letter from a staff member in the North Carolina office. The employee indicated in her resignation notice that she was leaving Conflict because "[Komorek] is incredibly rude and disrespectful to his coworkers; [Komorek] is very unprofessional…; [Komorek] also has sent coworkers pictures of himself for no apparent reason."

45. On April 15, 2021, Komorek was issued a warning letter due to excessive and inappropriate communications with various Conflict staff members. The letter was issued by Conflict directors, Fawcett and LaCorte, and countersigned by Defendant Komorek.

46.     On June 17, 2021, another employee of Conflict in the North Carolina office resigned her position with Conflict. As part of her reasons for resignation, the employee advised that Komorek made her job difficult. The employee communicated several complaints regarding Komorek in her resignation notice as reasons she was leaving Conflict. Specifically, she stated, "[Komorek] adding and deleting charges without communicating with me, his lack of following procedures, and his refusal to organize his expenses have all made my job unnecessarily difficult and I believe these actions should be brought to your attention so they can be addressed for the next person in my role."

47.     On or about April 15, 2021, Conflict Senior Management banned Defendant Komorek from coming to the North Carolina office and asked him to continue working from his residence for the meantime.

48.     Defendant Komorek seemed to not only to be having numerous issues and points of contention with most Conflict employees but also with long-time, third-party associates of Conflict.

49.     Specifically, Defendant Komorek complained to Conflict management on a regular basis about its long-standing New York based CPA. The persistent complaints to management were not well-founded or substantive. Rather, they were unreasonable, personal attacks athat consisted of statements such as: "This guy may be a Jew but he doesn't know his ass from a fucking hole in the ground. I'm gonna throw his fucking ass off a fucking bridge."

50.     The complaints about Conflict's long time CPA became so frequent and damaging that the accounting firm wanted to cease all business with Conflict in order to no longer deal with Defendant Komorek.

51.     Subsequent to his departure from Conflict, Conflict has become aware of multiple accounting entries made by Defendant Komorek which were erroneous and required Conflict to expend substantial time, effort, and money to make right.

52.     Towards the end of 2021 and the beginning of 2022, Defendant Komorek's acts grew more bizarre. For instance, during weekly scheduled video conference calls with Conflict personnel, Komorek was observed to regularly be traveling in and working out of a small camper trailer.

53.     On several occasions, Komorek exhibited numerous firearms and weaponry to Conflict employees present on the weekly video meetings.

54.     Although aware that the United States allows possession of such weapons, employees of Conflict found his demonstrations of firearms in company meetings odd and concerning.

55.     Sensing that Komorek's questionable management style was failing in the U.S., Conflict UK began collaborating with the North Carolina office on the development and implementation of various policies and procedures. These policies and procedures would ultimately have the effect of enhancing collaboration and alignment between Conflict's U.K. and U.S. teams and bridge the gaps in management and oversight that had arisen during the Covid travel restrictions period.

56.     Conflict UK also began training the North Carolina office to assist with policies and procedures.

57.     However, Komorek, without explanation, unequivocally refused, rejected, and impeded the implementation of the company policies and procedures.

58.     During the course of his employment, Conflict was forced to discipline Komorek on a number of occasions because of his egregious, insubordinate, and disloyal behavior.

59. During early 2022, Komorek's excessive spending and local office bookkeeping started to raise concern by directors at Conflict. In particular, a non-executive director began questioning Komorek's spending practices and accounting procedures.

60. As February 2022 approached, in light of the proposed new policies and procedures, Conflict's Senior Management opted to oversee Komorek's activities more closely than they had through Covid.

61. As part of this effort, Conflict's senior management also scheduled a trip to visit the North Carolina office to address their concerns regarding the management of U.S. Operations by Komorek.

### *Trudy Jacobson v. Conflict Int'l, et al*

62. In March of 2020, Conflict began negotiations with its current employee, Andrew McLaren ("McLaren"); in particular, McLaren, who is a former U.S. marine and veteran of the Iraq war, was to assist Conflict in finding new clients.

63. On March 24, 2020, Komorek, as U.S. Director of Operations for Conflict, signed an agreement with McLaren that McLaren would be compensated at "a rate of 10% net profit, per case, from new clients you bring to the company."

64. In the winter of 2021, McLaren was introduced to Trudy Jacobson who requested a variety of surveillance and investigative services.

65. Mr. McLaren is currently a defendant in litigation filed by Komorek and Trudy Jacobson in related suits in the Southern District of New York under cause numbers 22-cv-09467 and 22-cv-10177.

66. These facts and the following facts in this section are known and pled in the pleadings, motions and filings of cause number 22-cv-10177.

67.     McLaren in turn referred Jacobson to Conflict for investigative services.

68.     On March 2, 2021, Trudy Jacobson retained Conflict to investigate and surveil various persons, one of whom she had a long-term romantic relationship outside of her marriage. Conflict and Jacobson executed a contract. At the time of execution, Conflict's signatory was Stephen Komorek, Vice President.

69.     Throughout 2021 and 2022, Jacobson received services from Conflict and paid most, but not all of Conflict's fees due under her agreement.

70.     During her time as a client, Jacobson's sole point of contact was Komorek who was Conflict's officer and representative in the United States. At all relevant times, Komorek was Conflict's sole point of contact for Trudy Jacobson.

71.     Although Jacobson was a client of Conflict's, Komorek, upon information and belief, began receiving monies from Jacobson for other investigative, consulting, and business services while Komorek was still employed by Conflict and more importantly, while he was an officer of the company.

72.     Mrs. Jacobson has pled she paid Conflict a total of $1.8 million dollars in investigative fees.

73.     However, Conflict can only account for receiving a portion of the fees paid by or on behalf of Jacobson.

74.     Plaintiffs suspect that the difference in fees has been paid to either Komorek, API, or a third-party company of Komorek's with or without Jacobson's knowledge.

75.     Jacobson still owes monies payable to Conflict for services rendered and is in breach of her agreement with Conflict.

76.     Upon information and belief, Komorek has encouraged Jacobson to not pay the amounts due under the agreement.

77.     In early February of 2022, Komorek prepared for and requested that certain surveillance activities take place regarding the Jacobson matter.

78.     Per internal procedures, Komorek provided a briefing sheet and case notes to be approved and reviewed by senior management. Within the proposed surveillance briefing, Komorek indicated that he intended to disclose confidential case information to certain third parties without any written authorization from either Conflict or Mrs. Jacobson. The proposed course of activity placed Conflict, Jacobson, and the individual investigators at risk.

79.     After reviewing the proposed briefing, on February 1, 2022, Fawcett immediately sent Komorek an email detailing ten comments and concerns to Komorek regarding the proposal. Fawcett also reminded Komorek, "I would like to be clear that at all times we need to operate legally, proportionally with minimum risk of compromising our cases and ultimately risking any legal issues."

80.     Upon receiving the email, Defendant Komorek became enraged and, in a disrespectful manner, replied "There are no legal issues here or undo risk unless the team gets made; If you are not confident in me my ability to provide a sound and safe strategy for the client, replace me; This is one small piece to a larger puzzle of getting criminals in jail; This phase, as all cases are discussed with council and in house counsel to make sure no laws are being violated."

81.     Komorek's email responses were not rational or reasonable. Conflict does not conduct surveillance operations where significant legal issues exist. Conflict, as private investigators, simply investigate and report facts to their clients. Conflict does not "put criminals in jail." Although Conflict does have its own attorneys, no written opinion regarding the legality of any

issue had been provided by any licensed attorney in the jurisdiction the surveillance operation was located as Komorek had claimed.

82. Despite Komorek's responses, Conflict senior management restructured and updated the briefing in order to allow a lawful surveillance to be conducted in the Jacobson matter. In line with a frequently made request by Komorek, Conflict also sent a more experienced investigator to the United States to train and oversee the United States based Conflict employees and to report to senior management on the status of the operation.

83. With the Coronavirus restrictions now eased in both the United Kingdom and United States, LaCorte scheduled a trip from London to the North Carolina office to discuss the aforementioned issues with Komorek, as well to address Komorek's erratic behavior, mistreatment of Conflict personnel, and mistreatment of third-party vendors.

84. LaCorte scheduled his trip to arrive in the North Carolina office on March 1, 2022.

85. On or about February 24, 2022, McLaren, who had made the connection of Mrs. Jacobson to Conflict, learned, for the first time, that Jacobson had continued to employ Conflict and had paid Conflict a substantial amount in fees.

86. As the case manager and Vice President for the United States, Komorek was responsible to pay McLaren for the fees he had negotiated and for which he had signed a contract with Mr. McLaren months earlier.

87. Komorek failed to cause McLaren to be paid his full contractually earned fees. As such, McLaren was only paid a small percentage to which he was owed.

88. Upon learning of the long-standing client relationship between Conflict and Jacobson, McLaren contacted Komorek and asked why he had not been compensated the fees he was entitled to. Komorek became upset and enraged and stopped communicating with McLaren.

89.     Soon after, Komorek resigned his position without addressing his failure to compensate McLaren per their agreement.

90.     Komorek then encouraged Jacobson to cease employing Conflict or pay monies she owed Conflict under her contract, thus destroying the relationship between Conflict and Jacobson.

91.     Komorek purposely destroyed Conflict's relationship then convinced Jacobson to hire him and his new business entity API instead.

### *Komorek Resignation*

92.     On February 25, 2022 at 10:15 PM EST, Komorek, suddenly and without notice, resigned his position with Conflict by email.

93.     Within his resignation email, Komorek acknowledged that he had signed the non-disclosure agreement and stated, "I will continue to abide by our agreement of non-disclosure of confidential information belonging to Conflict."

94.     Prior to his leaving Conflict, Defendant Komorek filed as both an Incorporator and a Director the Articles of Incorporation for Defendant API with the Ohio Secretary of State on February 23, 2022.

95.     Komorek did not advise Plaintiffs that he had established a competing entity while in the employ of Plaintiffs.

96.     In addition to Defendant Komorek's resignation, Conflict received the resignation of Pat Welsh ("Welsh") on March 3, 2022.

97.     Welsh is now an employee, general counsel, director and/or senior manager of API International Consulting Group, Inc.

98.     Prior to separating from Conflict, Komorek was and currently is an investigator, director, and/or officer of API International Consulting Group, Inc.

99. Prior to his resignation, Komorek, in the presence of other employees, defaced and damaged the walls of Conflict's North Carolina office premises.

100. On April 14, 2022, Conflict received by delivery service Komorek's Conflict issued and owned laptop and mobile phone. However, the data on both Komorek's Conflict issued and owned phone and laptop were deleted. The data contained digital assets including company records and case information owned by Conflict.

101. Komorek destroyed his e-mail history as well as many of Conflict's U.S. electronic files shortly before he resigned.

102. Komorek systematically wiped all data from the devices owned by Conflict that were issued to him during the course of his employment.

103. Upon information and belief, Komorek made unauthorized copies of Conflict's confidential and proprietary information.

104. Upon information and belief, Komorek retained and continues to retain, access, and use unauthorized copies of Conflict's confidential and proprietary information.

105. On April 1, 2022, undersigned counsel sent a letter demanding Komorek to, among other things, return confidential and proprietary information and to pay repair damage caused by his vandalous acts to Conflict's office.

106. Conflict has incurred substantial damages and/or losses due to Komorek's unauthorized removal, possession, and impairment of Conflict's electronic files and documents, including, without limitation, the costs of investigating Komorek's actions and assessing the damage they caused.

107. After his termination from Conflict, Conflict discovered that Komorek had founded API and had begun competing directly with Conflict while still employed with Conflict.

108.     Komorek also began soliciting several of Conflict's clients and indicated to the clients that Conflict was no longer capable of servicing these clients without Komorek when in fact, Conflict was prepared and ready to service all of its clients.

109.     Komorek persuaded several of Conflict's clients to terminate their contracts with Conflict by utilizing Conflict's highly confidential information and client information, which he obtained during his employment with Conflict, and used in order to market additional services to these clients.

110.     As a result of Komorek's unlawful actions, several key clients have discontinued their relationship with Conflict and engaged Komorek and/or API, including but not limited to Trudy Jacobson.

111.     Komorek continues his use of this highly confidential information to solicit current Conflict clients.

112.     Komorek continues his use of this highly confidential information to destroy the relationships between Conflict and its clients.

113.     On April 26, 2022, another Conflict employee based in North Carolina alerted senior management that Komorek and Welsh had approached him approximately three weeks earlier, offering him a position with their new company, API International Consulting Group, Inc.

114.     At the time Defendant API and Defendant Komorek made the offer, they were aware that the employee held a critical position with Conflict.

115.     Conflict's employee reported that Komorek and Welsh told him that there were "a lot of possible legal issues coming down on Conflict International and that the US division may not be around by mid-summer."

116.    Upon information and belief, Komorek's and Welsh's misrepresentations were intended to destroy Conflict's relationship with its employees.

117.    The critical employee resigned from Conflict causing additional damage.

### *Komorek's Misrepresentations and Omissions*

118.    Concerned Komorek was on the precipice of launching a campaign of retaliation, Conflict began conducting a review of the representations made by Defendant Komorek in his resume, experience, and representations.

119.    Conflict began to uncover a web of lies, misstatements, omissions, misrepresentations, and innuendo that Komorek made to Conflict and its employees.

120.    For instance, Komorek represented on his June 2020 resume that he has had extensive investigative experience. Specifically, Komorek represented:

> Over 17 years' experience in Counterintelligence (C.I) and undercover C.I operations, providing detailed personality profiles on suspects, surveillance and asset tracking, advanced lie detection methods, and operation mission planning.

> Over 15 years' experience in working and coordinating with local nations, foreign nationals, and diplomats to secure and negotiate interests.

121.    The above representations made by Komorek indicate that Komorek was employed continuously in the counterintelligence and undercover investigation field since June 2003.

122.    However, in June of 2003 Defendant Komorek was enrolled in Wake College where he eventually left without graduating. Subsequently, Komorek was employed at Yellow Dot, a heating, air conditioning, electric and plumbing company, as an IT professional between September 9, 1999 and September 17, 2003 and then subsequently as an sales representative with TA Web Hosting from May 18, 2003 to July 16, 2004.

123.     In July of 2004, Komorek enrolled in the United States Army with a deferred enrollment but in October of 2004, Komorek was discharged prior to completing basic training.

124.     Komorek also represented on his June 2020 resume that he possessed the following experience:

>     Over 12 years' experience in warrant and personality-based lethal and non-lethal targeting, and utilizing ISR (Information, Surveillance, and Reconnaissance) assets.

>     Over 10 years' experience in selecting, training, and handling operational intelligence assets.

125.     However, Komorek joined the National Guard in May 2007 and was in active-duty training in December of 2007; he was not deployed to active duty until February 2009 negating the claimed 12 years' experience.

126.     Further, Komorek's final position on active duty appears to have been that of a Chaplain's Assistant rather than related to any intelligence activities.

127.     After Komorek left, Conflict senior management became aware that Defendant Komorek represented to certain Conflict employees and/or contractors that he had been employed with Delta Force, the Central Intelligence Agency, and the Kidnapping and Rescue Team of the Federal Bureau of Investigation based in Africa.

128.     Upon information and belief, Defendant Komorek has never been employed with Delta Force, the Central Intelligence Agency, and the Kidnapping and Rescue Team of the Federal Bureau of Investigation based in Africa.

129.     To date, Conflict has not located any record or individual confirming or indicating that Defendant Komorek was employed at any of the above agencies.

130.     After Komorek resigned his position with Conflict, several Conflict employees and third parties reported that, for some period, Defendant Komorek had represented on his LinkedIN

professional networking profile that he was employed by an OGA. "OGA" is an abbreviation for Other Government Agency; it typically refers to an agency that engages in or supports government intelligence gathering activities. Upon information and belief, Komorek never worked for any such agency.

131.    After Komorek's departure, Conflict was advised by well-known, verifiable, third-party, former United States Special Force members that Komorek had exaggerated his experience, intelligence, and information gathering capabilities.

132.    Plaintiffs respectfully acknowledge Komorek's military service. However, Komorek has grossly overstated his experience as it relates to intelligence gathering. Such representations were false when made to Conflict, Conflict UK, Conflict employees, staff, and other third-parties.

133.    In addition, Defendant Komorek represented he had been awarded qualifications through the World Institute for Security Enhancement, Inc. ("WISE").

134.    Specifically, Komorek indicated that he obtained qualifications in the areas of Executive Protection, Countering Terrorism, and Computer Forensics.

135.    However, Conflict has recently discovered that WISE is a North Carolina corporation formed in 2018 and controlled by Komorek — as the incorporator, registered agent, and sole director.

136.    In essence, Komorek misrepresented his certifications as being granted by an independent, third party when in fact, he had qualified himself.

137.    After Komorek resigned, Conflict also learned that Defendant Komorek had been sued for violations of the Stored Communications Act and violations of the Federal Wiretap Act.

138.    *Slyh, et al. v. Jones, et al* was filed against Komorek and his former employer in the United States District Court in the Southern District of Ohio, 2:19-cv-01475.

139.    The allegations in that suit were relevant to Komorek's position as an officer of the company and as an investigator with an international investigative and security business, such as Conflict.

140.    Komorek never divulged the existence of the lawsuit, that it was in the public domain, or that Komorek was a named defendant.

141.    By failing to advise Conflict that he was a defendant in such a case that was currently being litigated during his employment, Komorek breached his fiduciary duty as an officer of Conflict.

142.    Further, by failing to advise Conflict, who has a history and policy of conducting only legally compliant investigations, that Komorek had a history of conducting unlawful investigations, Komorek breached his fiduciary duty.

143.    Komorek further breached his fiduciary duties to Conflict by not disclosing the truth, and by failing to correct his omissions and misstatements.

144.    Had Conflict known of Komorek's past history and experience, or lack thereof, Conflict would not have hired Komorek for the position they did.

### The WAD Complaint

145.    The WAD is an international non-profit association of individual private investigators and security professionals with members in most countries located throughout the world. *See* https://wad.memberclicks.net/who-we-are. The WAD, a Nevada corporation, traces its inception (through the merger of the International Secret Service Association (founded in 1921) to just after the close of World War I. *Id.* Many of its members are ex-law enforcement officers, ex-intelligence officers, security professionals, lawyers, and other service professionals located throughout the globe. Membership in the association is personal and individual. Like most non-profits, the

management of WAD is conducted through a volunteer board of directors. *See* https://wad.memberclicks.net/wad-bylaws-.

146.    In addition to its regular meetings, continuing education, and networking, WAD polices its own members through the disciplinary procedure as outlined in its bylaws. *Id*. at Article XIII – Discipline.

147.    Like most non-profits, WAD also provides networking for investigative and security services. As an international association, individual members of WAD refer and receive business opportunities or requests for services to each other in their local areas.

148.    Komorek is a member of the WAD and a former member of the WAD Board of Directors.

149.    LaCorte is also a member of the WAD, past President, Chairman of the WAD, and a current voting member of the Board of Directors.

150.    Fawcett is a Managing Director of Conflict UK and a regular individual member of WAD.

151.    Roger Bescoby ("Bescoby") is a Conflict UK employee, regular individual member of WAD, and a current member of the WAD Board of Directors.

152.    Angelo Pascalides ("Pascalides") is an employee of Conflict UK and is a regular individual member of WAD.

153.    On June 23, 2022, LaCorte, Becoby, Fawcett, and Pascalides filed a joint ethics complaint as individual members of the WAD through its ethics procedures.

154.    Under the WAD bylaws, an appointed lower court and WAD Board do not have a "duty to investigate or accumulate evidence but only to receive pleadings, answers, depositions, interrogatories and documents as submitted by the complainant and respondent, and upon such pleadings and evidence reach a majority decision." *Id.* at Section 4.

155.    The complaint alleged six broad areas of potential ethics violations committed by Komorek.

156.    Under WAD's Robert's Rules of Order, ethics complaints in associations are generally considered confidential with limited exceptions. *See* Robert's Rules of Order § 63:2. A copy of the original complaint and exhibits, Komorek's response, the complainant's reply, and the WAD Board of Directors decision has been filed in a related matter, *Komorek, et al v. Conflict Int'l, Inc., et al*, Cause No. 22-cv-09467, Southern District of New York, Doc. 34-1, under seal.

157.    Other than the sealed exhibits filed in related proceedings and the filings in this Court, Conflict, LaCorte, Bescoby, Fawcett, and Pascalides have not disclosed the WAD complaint, the accompanying documents, or the WAD decision to any third party.

158.    Komorek, on the other hand, has disclosed the nature of the complaint in this Court's proceeding and elsewhere including on Law Enforcement Today ("LET"), an online blog.

159.    Conflict in its filings and submissions to the WAD board Bates stamped certain documents "confidential" and redacted the names and personally identifiable information of any client, investigation subject or investigation witness from its submitted documents.

160.    Given that the WAD Board of Directors is composed of other professional security and investigative professionals located throughout the world, Conflict redacted the information to protect the confidential and personally identifiable information.

161.    Komorek's responses in the WAD complaint were not fully redacted and provided names of Conflict clients, which by its very disclosure constituted a breach of the non-disclosure agreement.

162.    Komorek has appealed the decision of the WAD Board. The appeal is set to be heard on March 20, 2023.

*Law Enforcement Today Articles*

163.　Law Enforcement Today ("LET") is an online blog.

164.　LET is managed by Kyle Reyes, the Executive Director, and a close friend and associate of Komorek.

165.　Early in his employment with Conflict, Komorek convinced Conflict's senior management that Conflict should retain Reyes and Reyes' company, The Silent Marketing Partner, LLC ("SMP") for marketing services.

166.　Conflict hired SMP and Reyes and paid them tens of thousands of dollars for marketing services.

167.　Komorek indicated to Conflict that Reyes was the Executive Director of LET and as such Komorek had complete editorial control of what would be published on LET.

168.　In 2019, 2020, and 2021, several stories were published on the LET blog regarding Conflict.

169.　The LET stories of 2019, 2020, and 2021 featured certain managers and employees of Conflict and overall, were positive.

170.　After Komorek left Conflict, LET began posting stories that were derogatory, false, misleading, and slanderous against Conflict, its managers, and its professional associates.

171.　On December 24, 2022, LET published a story titled, "*Lawsuit: Once renowned international investigative firm alleged to have played clients, its own investigators.*" *See* Exhibit B.

172.　The story alleges to have been written by the pseudonym, Sgt. A. America.

173.　 Upon information and belief, Sgt. A. America is pseudonym known to be used by Komorek.

174.    The story discloses specific details from client investigations and client invoices and other identifiers that violate the non-disclosure agreement.

175.    The story is misleading and false in that it alleges that Conflict engaged in unethical practices, accuses its attorneys of committing crimes, and that officers and employees of Conflict are corrupt.

176.    Several factual items within the story are only known to Conflict and Komorek.

177.    The story was then sent by Komorek, the day it was written, to certain Conflict clients and professional associates of Conflict.

178.    Komorek caused the story to be written and published, through the assistance of Reyes with the sole purpose to damage and harass Conflict.

179.    By writing the story, Komorek violated his non-disclosure agreement disclosing certain client information and other confidential information that he learned while employed at Conflict.

180.    Komorek wrote and caused the story to be published with the sole intent to harass Conflict and interfere with its client, associate, employee, vendor, and professional relationships.

### Shapiro v. Law Enforcement Today and Kyle S. Reyes

181.    On September 24, 2022, Trevor Shapiro sued Law Enforcement Today ("LET"), Kyle S. Reyes and Capt. Robert Greenburg for defamation and intentional infliction of emotional distress in the Supreme Court of New York County under Index No. 158202/2022. *See* Exhibit C.

182.    The basis of Shapiro's Verified Complaint is that certain defamatory statements were published in two articles by LET and/or Kyle Reyes. *Id*.

183.    Shapiro is the known subject of investigation launched by Trudy Jacobson. And, referenced in the suit before Judge Ramos's court styled, *Trudy Jacobson v. Conflict International, Inc. et al.*,

in the United States District Court for the Southern District of New York, Docket No. 22-cv-10177.

184.    Jacobson has hired multiple private investigators to investigate Shapiro.

185.    Jacobson has sued Conflict claiming that Conflict provided confidential information to Shapiro.

186.    As part of its motion to dismiss, Conflict has produced written correspondence from Shapiro to Jacobson's husband detailing how Shapiro came to learn of the investigation ordered by Jacobson. *See Jacobson v. Conflict International, Inc. et al.*, S.D.N.Y., Docket No. 22-cv-10177, Doc. 30-2.

187.    In the January 2022 correspondence, Shapiro indicates that he did not learn about being under investigation from Conflict but rather from Jacobson herself and through other means.

188.    Shortly after the Shapiro sent the letter to Mr. Jacobson, Trudy Jacobson's counsel, Kevin Kearon of Barket Epstein Kearon Aldea & LoTurco, LLP, caused to be issued a demand and/or cease and desist letter to Shapiro based on the email Shapiro sent to Mr. Jacobson.

189.    Conflict had no prior notice that LET had published the articles complained of in Shapiro's Verified Complaint.

190.    On January 11, 2023, LET filed a Motion to Dismiss Shapiro's Complaint alleging various legal defenses.

191.    In support of its Motion, LET attached an exhibit that claims to be in response to a "due diligence request." The communication is purportedly from Conflict to LET, as it is signed by Stephen Komorek and dated June 13, 2021. *See* Exhibit D.

192. In the communication, Komorek falsely claims that Mike Tapling, an employee subordinate to Komorek, provided certain confidential information to Kyle Reyes. Komorek also falsely states that Mike LaCorte was aware of all actions.

193. Upon discovering the filing of LET's Exhibit, Conflict's Director of Compliance and Custodian of Records, Mehmet Goksen, conducted a search of all Conflict business records.

194. Mr. Goksen did not find any business record within its physical or electronic files that resembles the Exhibit filed in the Supreme Court of New York County. *See* Exhibit E.

195. LET's Exhibit is not a valid Conflict business record.

196. Further, the statement was neither written on Conflict letterhead nor sent from a valid Conflict email address.

197. Neither Conflict, Inc. nor Conflict UK has ever issued such a statement or letter for any type of media outlet for any client.

198. The document is signed as 'Further Affiant saith naught.' Those terms are not normally used in affidavits and statements produced by Plaintiffs.

199. Even more suspect, is that the statement is not notarized as is required for an affidavit in the State of New York. Yet, Mr. Komorek has signed it as an 'affiant.'

200. Further, Mr. Tapling has confirmed that in fact the purported statement by Komorek is not true and distorts critical facts. *See* Exhibit F.

201. At no time did Conflict, Conflict UK, or LaCorte provide, know about, or approve confidential information being provided to the online blog LET.

202. Conflict had no prior notice that LET had or would publish the articles complained of in Shapiro's Verified Complaint.

203.    Conflict had never approved the delivery of any confidential information to LET regarding any case or investigation.

204.    Upon information and belief, Komorek disclosed such information to LET after he resigned from the employe of plaintiffs or at times he was not working for Plaintiffs.

205.    Komorek and Kyle Reyes are known to be close associates and friends.

206.    Neither Conflict nor LaCorte ever authorized or sanctioned the disclosure of confidential information.

207.    Komorek also failed to advise Conflict in writing or otherwise, per his non-disclosure agreement, that he or anyone under his direction would provide confidential or case specific information to LET.

208.    Upon information belief, Komorek manufactured the factually incorrect statement for his associates and friends at LET, and for the benefit of his new client, Trudy Jacobson, whose case is before Judge Ramos's court in the Southern District of New York.

209.    Komorek also manufactured the factually incorrect statement to damage Conflict's reputation and relationship with its clients, including Trudy Jacobson.

210.    Further, Komorek signed the statement in order to overcome pleading deficiencies, namely that Shapiro had independently learned of the investigation from Jacobson herself, by filing a false statement in LET's Motion to Dismiss.

### *Campaign of Phone Texts and Emails*

211.    After the WAD complaint had been filed, several text and email messages were sent by or caused to be sent by Komorek.

212.    Komorek's purpose in sending the communications was to destroy Conflict's relationships with business associates, employees, clients, vendors, attorneys, and others.

213.    On October 23, 2022, undersigned counsel who represented Conflict in a related case, received a text message stating, "My friend wasting time is robbing oneself" from an unknown phone number.

214.    Upon information and belief, this message was sent by Komorek to damage the relationship between Conflict and its attorney.

215.    On December 10, 2022, McLaren received a text message stating, "Have you quit your job yet?" from an unknown phone number. McLaren received the text, while employed with Conflict.

216.    Upon information and belief, this message was sent by Komorek to damage the relationship between Conflict and its employee.

217.    On or around December 25, 2022, Komorek sent a communication from his email to Client #1, an international investigator and member of the WAD.

218.    On the same date, December 25, 2022, at 12:31A.M. Eastern Standard Time a New York investigator, vendor, and referral source for Conflict received a similar text message linking the article believed to have been written by Defendant Komorek to his mobile phone.

219.    Komorek's communication linked to a story on Law Enforcement Today ("LET") alleging that Conflict had been accused of "bilking a client through bogus billing."

220.    According to LET, the story was written by Komorek's pseudonym Sgt. A. America.

221.    Conflict has recovered several pieces of data and emails from Komorek's Conflict account and company drives which indicate that Komorek previously wrote articles for LET under the name Sgt. A. America.

222.    Komorek's email communication to Client #1 caused damage to Conflict.

223.    Komorek knew that Client #1 was a member of the WAD.

224.    Komorek also knew that Client #1 was Conflict's regular client because as Conflict's employee, Komorek worked on cases that were referred by Client #1 or had Client #1 listed as the investigative case contact.

225.    While the WAD appeal has been pending, emails from unknown, untraceable, and anonymous emails have also been sent to certain Board members of the WAD.

226.    Specifically, on December 29, 2022, an email was sent to twenty-two (22) board members' personal email addresses linking to an article in an online blog, Law Enforcement Today, alleging wrongdoing by Conflict. These anonymous emails also alleging and implying that certain board members, including LaCorte and undersigned counsel, were corrupt.

227.    On January 19, 2023, another anonymous email was sent to twenty-seven (27) WAD board members' personal email. The email implied corruption within the WAD and attacked the Chairman of the Lower Court Committee who had heard the ethics charges against Mr. Komorek.

228.    Komorek's email also attacked LaCorte and undersigned counsel, falsely alleging that the three individuals had engaged in criminal activity. In fact, none of the attacked individuals have ever been formally charged or convicted of any criminal activity.

229.    The December 29, 2022 and January 19, 2023 emails were especially damaging for both Conflict and Conflict UK, as LaCorte is Plaintiffs' CEO.

230.    The email and allegations imputing corruption to LaCorte were designed to harm the Conflict business.

231.    Many of the individual recipients of Komorek's email are known professional contacts and associates of both Conflict and Conflict UK as the sources of referral business or as vendors for Plaintiffs.

232. The December 29, 2022 and January 19, 2023 emails to included individuals who are regular client of Plaintiffs or have had a business relationship with clients.

233. Specifically, Plaintiffs' Clients #2, 3, 4, 5, 6, 7, 8, 9, 10, & 11 received the emails sent or caused to be sent by Komorek.

234. Komorek knew that these individuals had a business relationship with Plaintiffs.

235. Upon information and belief, Komorek caused these communications to destroy the business relationships between Plaintiffs and Clients #2 though 11.

### *The Florida Soccerex Complaint*

236. As a part of its business, Conflict, UK provides security related services to various professional soccer clubs in Europe.

237. Conflict, UK representatives are also known to attend certain professional soccer conferences located throughout the globe. Like any industry and profession, conferences are a way to network, meet contacts, and reunite with professional friends.

238. In late 2021 and early 2022, a Conflict, UK representative was invited to attend a Soccerex event in Miami, Florida on behalf of several professional friends and contacts. Soccerex is an organization which hosts various global events related to professional Soccer teams.

239. The Conflict, UK representative noticed his co-workers at Conflict that he would be attending and would try and network with current and former international clients.

240. Komorek became aware that the Conflict, UK representative would be attending the networking event in Miami, Florida through Conflict online meetings. Inexplicably, Komorek began to protest that the representative was not licensed in Florida. Komorek demanded that he be Conflict's representative at the event.

241.    Komorek's assertions didn't make sense for two reasons. First, no State has required a professional license to attend a networking event. Second, Conflict already had authority in the State of Florida through its reciprocal license in the State of North Carolina to conduct regulated activity.

242.    In fact, Komorek had attended networking events while in the employ of Conflict and past employers in various jurisdictions for years.

243.    These protests by Komorek were in fact a pretext in an attempt to commandeer Conflict, UK's more profitable clients by excluding the UK representative.

244.    Upon information and belief, Komorek filed an anonymous complaint with the Florida Division of Licensing on April 3, 2022. The complaint alleged that Conflict "attended Soccerex 2022 in Miami" thereby "violat[ing] Chapter 493 in that they not licensed in the State of Florida…."

245.    The Florida Division of Licensing conducted an investigation into Conflict's activities.

246.    To aide in that investigation, Fawcett, as a Conflict representative, provided a detailed sworn statement to the Florida licensing authority indicating that the event was a networking event in Miami with clients.

247.    After investigation, the Florida Division of Licensing dismissed the complaint on June 5, 2022 because the complainant could provide no proof of unlicensed activity and the complaint was without merit.

248.    In essence, the Florida Division of Licensing agreed with Conflict that no professional license was required when attending a networking event in the State of Florida.

249.    Upon information and belief, Komerek filed the complaint to harass and injure Conflict and to manufacture evidence for his later filed lawsuit which is now pending before Judge Ramos's court in the Southern District of New York.

### *The New York Complaint*

250.    On December 24, 2022, LET published its story regarding Conflict, LaCorte and others styled "*Lawsuit: Once renowned international investigative firm alleged to have played clients, its own investigators*." The article was written by Sgt. A. America a known pseudonym of Komerek's.

251.    The article alleges that a complaint with the New York licensing authority was filed against Conflict by an un-named client.

252.    In February 2023, Conflict became aware that a complaint was filed with the New York licensing authority. The status of that complaint is unknown.

253.    Conflict vehemently denies any wrongdoing or violation of any licensing and regulatory authority in New York or elsewhere.

254.    Upon information and belief, Komerek or Jacobson, at Komerek's behest, has filed the complaint to harass, injure, and needlessly expend resources of Conflict.

255.    Upon information and belief, Komerek and Jacobson, at Komerek's behest, have filed said complaint in order to manufacture evidence in Jacobson's cause of action before this court.

## COUNT ONE
## BREACH OF CONTRACT AGAINST KOMOREK

256.    Conflict repeats and realleges the allegations contained in paragraphs 1 through 255, as if fully set forth herein.

257.    Conflict has been and continues to be damaged because of Komorek's material breach of the non-disclosure agreement.

258.    Unless permanently enjoined, Komorek will continue to divulge and use Conflict's Confidential Information, thereby causing Conflict irreparable injury for which there is no adequate remedy at law.

259.    The purpose of such disclosures is to harm Conflict and destroy it business, contacts, and relationships.

260.    Conflict provides its clients with customized investigative services, which are developed after gaining intimate knowledge and facts of the case and the specific and unique needs of each client. After Conflict develops a customized plan for each client, additional services, and adaptations are typically required. As the provider of a service based on the facts of each case and each client's particular needs, Conflict is at a unique competitive advantage to provide such additional services and adaptations.

261.    Conflict has expended significant resources in terms of capital investment and labor, to develop its goodwill and its client relationships.

262.    Conflict also expends significant resources in terms of capital investment and labor, to develop and execute professional, customized services for its clients.

263.    Given his position as a Director and Vice-President, Komorek eventually served as the primary interface between Conflict and its clients for the provision of investigative services to its clients. Komorek was integral in, and took the lead on, all aspects of providing services to Conflict's clients in the United States.

264.    Through interaction with Conflict's clients, personnel and other experts, as well as training paid for by Conflict, Komorek has obtained a great deal of confidential information and experience at the expense of Conflict.

265. Conflict also provided Komorek with access to additional privileged and confidential trade-secret information regarding Conflict's cost structure, supply vendors, client relationships and sales strategies with respect to the entire range of services offered by Conflict.

266. During his employment with Conflict, Komorek also had access to client accounts, client referrals, client leads, and new accounts generated by Conflict's principals and employees.

267. Komorek gained intimate knowledge of Conflict's client base, client files, case details, client lists and identities, and other confidential and proprietary information not known to the general public.

268. Conflict has gained a competitive advantage in the marketplace through its development of customized and confidential services and solutions for its clients, as well as its cost structure, supply vendors, client relationships, strategies, client files, client lists and identities, and other confidential and proprietary information not known to the general public. Conflict has taken careful measures to treat this information as highly confidential information and/or trade secrets. These measures include, among other things, requiring all employees to sign non-disclosure agreements upon hiring, which contain terms identical to those contained in Komorek's Agreement.

269. Komorek's conduct, as described above, constitutes a breach of the non-disclosure agreement.

270. Under the terms of the Agreement, Komorek had a duty to refrain from disclosing the company's confidential and proprietary information. Komorek has obtained and retained Conflict's confidential information and breached the non-disclosure agreement by using such materials to the detriment of Conflict and for his own economic benefit.

271.     Komorek has also breached the non-disclosure agreement by releasing confidential information to damage Conflict's reputation and relationship with its clients.

272.     Komorek may also exploit Conflict's goodwill by soliciting Conflict's clients and using Conflict's confidential information to attract additional clients.

273.     Komorek has used this confidential and proprietary information and has demonstrated he will inevitably continue to use other confidential information within his knowledge, in breach of the non-disclosure agreement.

274.     By reason of the foregoing, Komorek has breached and will continue to breach the valid and enforceable non-disclosure agreement.

275.     Conflict has sustained losses and damages as a direct and proximate result of Komorek's wrongful actions described herein in an amount to be determined at trial.

276.     Conflict is also entitled to injunctive relief to prevent Komorek's continued threatened or actual breach of the non-disclosure agreement.

## COUNT TWO
## BREACH OF FIDUCIARY DUTY AGAINST KOMOREK

277.     Conflict repeats and realleges the allegations contained in paragraphs 1 through 276, as if fully set forth herein.

278.     Conflict placed a high level of confidence in and reliance on Komorek who claimed to have special expertise in the areas of intelligence, surveillance and security.

279.     Conflict relied on Komorek's claims when entering into the employment relationship.

280.     At all relevant times, Komorek had a fiduciary relationship with Conflict.

281.     Komorek owed Conflict the fiduciary duties of honesty, care, and loyalty.

282. Komorek owed these duties to Conflict pursuant to N.Y. Bus. Corp. Law § 715 in that "an officer shall perform his duties as an officer in good faith and with that degree of care which an ordinarily prudent person in a like position would use under similar circumstances."

283. Komorek had and continues to have a specific legal duty to refrain from acting in a manner that is contrary to Conflict's best interests.

284. Komorek has utilized and continues to utilize confidential and proprietary information he obtained exclusively through his employment with Conflict for his own personal benefit and against the interests of Conflict.

285. Defendant Komorek breached the fiduciary duties of honesty, care, and loyalty by, among other things: (i) making false representations about his qualifications; (ii) failing to disclose to Conflict the litigation filed against Komorek for wiretapping (iii) misappropriating funds and assets of the corporation; (iv) engaging in self-dealing; (v) misappropriating confidential and proprietary information of Conflict; (vi) encouraging and continuing to encourage Conflict's clients to seek services from him and/or his competing entity; (vii) encouraging and continuing to encourage Conflict's employees to seek employment with him and/or his competing entity; (viii) contacting and continuing to contact Conflict's current clients to steer those clients away from Conflict and to Komorek and/or API for services from his competing entity.

286. As a direct result of Komorek's breach of fiduciary duties owed to Conflict, Conflict is entitled to an accounting of the value of the business generated by the clients Defendants have diverted from Conflict.

287. In equity and good conscience, Komorek and API should be required to disgorge the benefits, profits, and fees he improperly received.

288.    By reason of the foregoing, Komorek has breached his fiduciary duties to Conflict and the continued violation of these duties will cause serious and irreparable damage to Conflict.

289.    Conflict has sustained losses and damages as a direct and proximate result of Komorek's wrongful actions described herein and an amount to be determined at trial.

290.    Conflict is also entitled to injunctive relief to prevent Komorek's continued threatened or actual breach of his fiduciary duties.

291.    Komorek's misconduct evinced such a high degree of moral culpability as to warrant punitive damages.

**COUNT THREE**
**UNJUST ENRICHMENT**
**AGAINST KOMOREK**

292.    Conflict repeats and realleges the allegations contained in paragraphs 1 through 291, as if fully set forth herein.

293.    During the course of Komorek's employment with Conflict, Komorek was provided access to Conflict's confidential files, contacts. and databases containing client information.

294.     Komorek accepted the benefit and has been enriched by the same as he uses and continues to use Conflict's client information for his own personal benefit and that of API to the detriment of Plaintiffs.

295.    Komorek understood and appreciated that Conflict's client database had been accumulated over time and after expending considerable resources and building goodwill and that Conflict was not providing it gratuitously.

296.    Komorek's retention of the benefit without payment of the value thereof would be unjust and inequitable.

297.   Komorek's misconduct evinced such a high degree of moral culpability as to warrant punitive damages.

**COUNT FOUR**
**TORITOUS INTERFERENCE WITH CONTRACT**
**AGAINST KOMOREK AND API**

298.   Conflict, repeats and realleges the allegations contained in paragraphs 1 through 297, as if fully set forth herein.

299.   Conflict and Trudy Jacobson entered into a contract for private investigative services (the "PI Contract") dated March 2, 2021. The Agreement was at all relevant times a valid, binding, and enforceable contract.

300.   At all relevant times, Komorek was aware of the existence and the terms of the PI Contract; in fact, Komorek executed the contract on Conflict's behalf while employed there.

301.   In his position as a trusted and key employee of Conflict, Komorek was aware that Conflict had established contractual, business, and or prospective relationships with several clients including Jacobson.

302.   Despite this knowledge, Komorek attempted to induce, entice, procure, and solicit Conflict's customers, including Trudy Jacobson, to violate, repudiate, and or breach their contractual, business, and prospective relationships with Conflict.

303.   The means used by Komorek in effecting this interference were intentional, malicious, unlawful, unfair, and otherwise improper.

304.   Conflict has sustained losses and damages as a direct and proximate result of Komorek's wrongful actions described herein and amount to be determined at trial.

305.   Conflict is also entitled to injunctive relief to prevent Komorek's continued threatened or actual interference with the contractual, business, and prospective relationships of conflict.

## COUNT FIVE
## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE
## AGAINST KOMOREK

306.    Conflict repeats and realleges the allegations contained in paragraphs 1 through 305, as if fully set forth herein.

307.    In his position as a trusted and key employee of Conflict, Komorek was aware that Conflict had established prospective relationships with several members of WAD.

308.    Conflict had business relationships with several WAD members that included the referral of business between individual members and Conflict.

309.    Specifically, Conflict and Client #1 had a long-standing business relationship and Client #1 was Conflict's regular client.

310.    Despite this knowledge, Komorek attempted to induce, entice, procure and solicit several members of WAD to violate, including Client #1, to repudiate and or breach their prospective relationships with Conflict.

311.    Komorek knowingly sent a false and defamatory email Client #1. The email contained a link a story on Law Enforcement Today ("LET") alleging that Conflict had been accused of "bilking a client through bogus billing."

312.    Komorek acted in bad faith and used wrongful and oppressive means and tactics, for wrongful motives, in interfering with Conflict's prospective advantageous business relations with Client #1 and others by knowingly sent a false and defamatory email to Client #1.

313.    As a result of Komorek's misconduct, Conflict has been deprived of its prospective economic advantage.

314. The loss of these business opportunities and damage to Conflict's business relationship with Client #1 would not have occurred but for Komorek's activities in that Komorek's actions damaged Conflict's relationship with Client #1 and prevented Client #1's ongoing use of Conflict's investigative services.

315. As a proximate and direct cause of Komorek's actions, Conflict has sustained losses and damages in an amount to be determined at trial.

316. The damages flow directly from and are the natural and probable consequences of Komorek's wrongful conduct.

317. Komorek's misconduct evinced such a high degree of moral culpability as to warrant punitive damages.

318. Conflict is entitled to punitive damages against Komorek in an amount to be determined at a trial of this action.

319. Conflict is also entitled to injunctive relief to prevent Komorek's continued threatened or actual interference with prospective advantageous business relations of Conflict.

## COUNT SIX
## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE AGAINST KOMOREK

320. Conflict repeats and realleges the allegations contained in paragraphs 1 through 319, as if fully set forth herein.

321. In his position as a trusted and key employee of Conflict, Komorek was aware that Conflict had established prospective relationships with several members of WAD.

322. Conflict had business relationships with several WAD members that included the referral of business between individual members and Conflict.

323.     Specifically, Conflict and Clients 2 through 11 had a long-standing business relationship and Clients 2 through 11 constituted Conflict's regular clients who referred business to Conflict on a regular basis.

324.     Despite this knowledge, Komorek attempted to induce, entice, procure and solicit several members of WAD to violate, Clients 2 through 11, to repudiate and or breach their prospective relationships with Conflict.

325.     Komorek knowingly sent a false and defamatory email Clients 2 through 11. The email contained a link a story on Law Enforcement Today ("LET") alleging that Conflict had been accused of "bilking a client through bogus billing."

326.     Komorek acted in bad faith and used wrongful and oppressive means and tactics, for wrongful motives, in interfering with Conflict's prospective advantageous business relations with Clients 2 through 11 and others by knowingly sending a false and defamatory email to Clients 2 through 11.

327.     As a result of Komorek's misconduct, Conflict has been deprived of its prospective economic advantage.

328.     The loss of these business opportunities and damage to Conflict's business relationship with Clients #2 through 11 would not have occurred but for Komorek's activities in that Komorek's actions damaged Conflict's relationship with Clients #2 through 11, and prevented Clients 1 through 8's ongoing use of Conflict's investigative services.

329.     As a proximate and direct cause of Komorek's actions, Conflict has sustained losses and damages in an amount to be determined at trial.

330.     The damages flow directly from and are the natural and probable consequences of Komorek's wrongful conduct.

331.    Komorek's misconduct evinced such a high degree of moral culpability as to warrant punitive damages.

332.    Conflict is entitled to punitive damages against Komorek in an amount to be determined at a trial of this action.

333.    Conflict is also entitled to injunctive relief to prevent Komorek's continued threatened or actual interference with prospective advantageous business relations of Conflict.

## COUNT SEVEN
## UNFAIR COMPETITION
## AGAINST KOMOREK AND API

334.    Plaintiff Conflict repeats and realleges the allegations contained in paragraphs 1 through 333, as if fully set forth herein.

335.    Komorek has engaged in conduct intended to undermine, destroy, and misappropriate the business of Conflict by using Conflict's confidential business information, proprietary materials, to compete unfairly with Conflict in violation of Komorek's contractual and common law obligations.

336.    Conflict's confidential business information known to be in the possession of defendants through unlawful or improper means, as outlined above, have tremendous business importance and value to Conflict. Those illegally and improperly obtained materials are central elements for Conflict's current and future development efforts and resulting future business endeavors.

337.    Defendant's misappropriation gave itself an unfair advantage because it failed to pay Conflict for the Confidential Information it was using for its own benefit and failed to make an investment to develop its own Confidential Information.

338.    Defendants in all the conduct set forth above have acted intentionally and willfully against the legal rights of Conflict.

339. Conflict has been and will continue to be severely injured by reason of Defendants' unfair competition, unfair business practices and wrongful misappropriation of Conflict's confidential business information.

340. As approximate and direct cause of Komorek's actions, Conflict has sustained losses and damages in an amount to be determined at trial.

341. Komorek's conduct constitutes common-law unfair competition, and unless restrained by appropriate injunctive relief, Conflict will suffer irreparable injury for which it has no adequate remedy at law.

342. Defendants' irresponsible and unfair competition with Plaintiffs, if left unchecked, can in very short order damage Conflict's reputation for honesty, integrity, reliability and economic viability which it labored for over twenty years to achieve. It may also act as a signal to Conflict's current employees that the non-disclosure agreements which they signed can be breached with impunity. The harm to plaintiff's reputation and business would be an irreparable blow to plaintiff's ability to attract new and repeat clientele.

343. Upon information and belief, Conflict has no adequate remedy at law, inasmuch as the damage done and intended to be done to Conflict by Defendants are continuous injuries, the full extent of which could never be ascertained, measured, or proven, and would involve endless litigation, harassment and expense. Unless the aforesaid activity by Defendants is permanently enjoined by the Court, Conflict will suffer irreparable and continuous injury in addition to the damages, injuries and losses which it has already sustained.

**COUNT EIGHT**
**ABUSE OF PROCESS**
**AGAINST KOMOREK**

344. Plaintiffs repeats and reallege the allegations contained in paragraphs 1 through 343, as if fully set forth herein.

345. On November 30, 2022 Komorek caused to be commenced suit against Conflict in the case of *Trudy Jacobson v. Conflict International, Inc. et al.*, in the United States District Court for the Southern District of New York, Docket No. 22-cv-10177, in which Jacobson claimed against plaintiff a sum in excess of $75,000, an amount far in excess of any amount validly due.

346. On November 4, 2022 Komorek commenced or a suit against Conflict in the case of *Steven Komorek and API Consulting Group, Inc. v. Conflict International, Inc. et al.*, in the United States District Court for the Southern District of New York, Docket No. 22-cv-9467, in which Komorek and API claimed against Conflict Inc. a sum in excess of $200,000, an amount far in excess of any amount validly due.

347. Upon information and belief, Komorek caused to be filed or filed a baseless complaint with the Florida Division of Licensing on April 3, 2022 *alleging* that Conflict Inc. "attended Soccerex 2022 in Miami" thereby "violat[ing] Chapter 493 in that they not licensed in the State of Florida…."

348. On May 13, 2022 Komorek commenced or caused to be commenced a complaint with the North Carolina Protective Services Board; the Board's Grievance Committee issued a warning and concluded that Conflict *under the supervision of Stephen Komorek* did fail to offer a report to a client.

349. Upon information and belief, Komorek filed or cause to be filed a baseless complaint with the State of New York alleging unknown violations of the law and regulations regulating private investigators.

350.     Komorek's willful, illegal, improper, or perverted use of process was to accomplish result/ "collateral objective" outside its lawful scope.

351.     Defendant utilized the above-described complaints for the purpose of tying up Plaintiffs' assets and time as to prevent Plaintiffs from carrying on Plaintiffs' business and thus forcing Plaintiffs to pay an amount far in excess of defendant's legitimate claim against Plaintiff.

352.     Defendant also used the process to manufacture evidence and file malicious complaints to interfere and diminish with Plaintiffs business relationships.

353.     Defendant also used the issued process to publish to members of the WAD and, thus, destroy its relationships with referral sources and to commandeer its business in the United States.

354.     As a result of Komorek's above-described malicious abuse of the process of the above-mentioned forums, Conflict has suffered harm and injury to its reputation, standing and credit, and loss of business.

355.     The damages flow directly from and are the natural and probable consequences of Komorek's wrongful conduct.

356.     Komorek's misconduct evinced such a high degree of moral culpability as to warrant punitive damages.

357.     Conflict is entitled to punitive damages against Komorek in an amount to be determined at a trial of this action.

**COUNT SEVEN**
**INJUNCTIVE RELIEF**

358.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 357, as if fully set forth herein.

359.     Plaintiffs seek an injunction prevention Komorek and his agents, including their attorneys, from making disclosures in violation of the non-disclosure agreement.

360.　Komorek has breached the non-disclosure agreement. Due to Komorek's breach, continuing and future violations of the non-disclosure agreement is imminent.

361.　Defendants have published false and defamatory statements about Conflict, and have tortiously interfered with Plaintiffs' contract and prospective business advantage.

362.　Further, Komorek has filed a partially untrue statement containing confidential information that purports to be a Conflict business record.

363.　The statement is not a business record and discloses certain information which is prohibited

364.　Unless Komorek and his agents are enjoined from violating the non-disclosure agreement, publishing false and defamatory statements, and tortiously interfering with Plaintiffs clients and prospective business advantages, Conflict and Conflict Ltd. will suffer serious and irreparable harm through the improper disclosure of confidential information.

365.　Plaintiffs Conflict and Conflict Ltd. have no adequate remedy at law other than the injunction of this Court because once confidential information is disclosed, its confidential status cannot be returned and the resulting harm cannot be undone. An award of damages would be insufficient to compensate for all of the harm caused to Plaintiffs from the improper disclosure of confidential information, including disclosure that may occur in the future.

366.　The equities favor Conflict and Conflict Ltd., the victims of Komorek's and his agents' wrongdoing.

367.　The non-disclosure agreement expressly entitles Plaintiffs to seek "injunctive relief as a remedy for any breach or threatened breach thereof…."

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Conflict respectfully requests that the Court enter judgment as follows:

a. Imposing preliminary and permanent injunctive relief ordering Mr. Komorek to refrain from: (a) breaching the terms of his non-disclosure agreement with Conflict (b) engaging in any activity in violation of the non-disclosure agreement including disclosing, divulging, furnishing, using or making accessible to anyone, Plaintiffs' proprietary or confidential information; and (c) from interfering with Plaintiffs client relationships;

b. Awarding damages in favor of Conflict, in an amount to be determined at trial plus interest, attorneys' fees and costs;

f. Punitive damages;

g. Awarding Conflict its attorneys' fees, reasonable litigation expenses and costs incurred in connection with this this action;

d. An award of interest for the maximum amount permitted by law;

f. Granting Conflict such other and further relief as the Court deems just and proper.

Dated: March 14, 2023
New York, New York

Respectfully Submitted,

J. W. BEARDEN & ASSOCIATES, PLLC

*/s/ Wes Bearden*
James "Wes" Bearden
Pro Hac Vice Admission Pending
New York Bar No. 5806500
Texas Bar No. 24071964
Louisiana Bar No. 33004
District of Columbia Bar No. 1671443
1341 Mockingbird Lane, Suite 820
Dallas, Texas 75247
Tel: (214) 396-7622
Fax: (888) 731-6940
Email: wes@beardenlawfirm.com

Ashley Mule'
Pro Hac Vice Admission Pending
Louisiana Bar No. 30191
110 Veterans Memorial Blvd, Suite 500
Metairie, LA 70005
Tel: (504) 301-8677
Fax: (888) 731-6940
Email: ashley@beardenlawfirm.com

Christopher Roesch Neff
Moskowitz Colson Ginsberg & Schulman, LLP
80 Broad St., Suite 1900
New York, NY 10004
Tel: (212) 257-6451
Fax: (212) 398-8835
Email: cneff@mcgsllp.com

ATTORNEYS FOR PLAINTIFFS

**VERIFICATION**

UNITED KINGDOM                              )     LONDON UK

COUNTY OF _____            )

I, Jonathan Fawcett, being duly sworn, deposes and says that I am a Managing Director of Conflict International Ltd. who is plaintiff in the case captioned Conflict International, Inc. and Conflict International Ltd. v. Stephen Komorek and API International Consulting, Inc. and have authorized the filing of this complaint. I have reviewed the allegations made in the complaint, and to those allegations of which I have personal knowledge, I believe them to be true. As to those allegations of which I do not have personal knowledge, I rely on our internal documents, emails, letters, pleading in other matters and I believe them to be true.

_____
Jonathan Fawcett, Managing Director,
Conflict International Ltd.

Sworn to me this 14 day of MARCH, 20 23

_____
Notary Public

NOTARY PUBLIC
LONDON UK
14-3-2023



Gopal Krishan Gupta MBE
GKG Notary
Tel: +44 20 8960 2800
Mob: +44 795 808 3458
1 Kings Avenue
Winchmore Hill
London N21 3NA

Gopal Krishan Gupta MBE
GKG Notary
Tel: +44 20 8960 2800
Mob: +44 795 808 3458
1 Kings Avenue
Winchmore Hill
London N21 3NA